I need to interrupt, but I said that because of us. I have to go back to my app. I have to go back to my app. We have three separate cases to be argued in succession. They all bring different legal issues before us, but they arise out of the same general proceeding in the district court. So we're going to hear the three cases, obviously, separately. But there is, as all of you know, or at least the lawyers know, there is an appeal of the district court's liability determination that is currently pending before our court, before a different panel. And so, this is just to say, do not expect anything from this panel anytime before that panel rules on the appeal of the merits ruling with regards to VRA liability. We can't do remedies before the other panel does liability. So, we will begin working on all of the cases once we finish the arguments today. But obviously, no opinion will come out from this panel until the merits panel issues its opinion. Okay. All right. With that, our first case is number 24-10230, Alpha Phi Alpha versus the Secretary of the State of Georgia.  Good morning, Your Honors, and may it please the Court, Ari Stavitsky for the Alpha Phi Alpha plaintiffs. Your Honor, Section 2 rights and Section 2 remedies belong to injured voters. And so, we must look to the voters to determine whether a remedy substantially addresses a Section 2 violation. That's what Shaw v. Hunt says. That's what Shaw and Lulak v. Perry teach. That is what they do. But the remedial plans that were erroneously approved by the district court here don't fix vote dilution for the voters who have a Section 2 right and who need a remedy. Black voters in South Metro Atlanta. We proved a trial, cracked, submerged in white-majority districts under the old plans, and they are still suffering, and I'm quoting again from Shaw at page 917, still suffering precisely the same injury that they were before these remedial plans were enacted. One way I've had the pleasure or displeasure of sitting on two or three judge redistricting cases over the course of my time on the bench, so one way that I at least begin to try to figure out both liability phase and remedy phase in these sorts of cases is to figure out what the world looked like before and what the world looked like afterwards. So without argument, tell me what changed from the map initially enacted by the Georgia legislature in 21 and the one that the district court approved that was passed in 23 with regards to the issue that you are presenting. Tell me what changed in terms of, for example, district numbers, district black voting age population strength, etc. So, Your Honor, and I think again, the most important thing is what changed for injured voters. The first question is not a legal one. It's a purely factual one. Understood. It doesn't determine whether you're right or they're right. I just want to know, and I'm going to ask them the same question. I'm going to ask the same question in all three cases. What changed or didn't change between the 21 map and the 23 map with regards to the districts that you are here about? Understood, and let me start with the Senate. So in the Senate map, the state took areas that were in Senate Districts 10 and 44 that were already black majority districts, and it moved those districts north. So they're still black majority districts, but now they're bringing in tens and tens, almost 100,000 total voters from who have no Section 2 right in. And then it displaced the southern part of where those districts were with a new district that they labeled District 17, but that is comprised almost entirely of folks who don't have a Section 2 injury. And then District 28 they also added. Why didn't they have a Section 2 injury? Because they were already in black majority districts where they were able to form effective majorities and elect candidates of choice notwithstanding racially polarized voting. And that's the question, right? And if that's the case, where's the harm? If everybody who was supposed to have vote dilution remedied has vote dilution remedied, where is the cognizable harm with the remedy? And, Your Honor, the problem is no one who was supposed to have vote dilution remedied had vote dilution. Virtually no one in the Senate. And this is on page 22 of our brief. These are undisputed numbers about how many black voters were added to black majority districts. Those are the injured voters, the folks who were cracked, submerged in white majority districts before, could have been added into black majority districts where they will then have the opportunity to join effective majorities, elect candidates of choice that will equalize opportunity in the area. Across the entire Senate map, it's a net gain of 3,000 black voters in black majority districts. A single Senate district is 190,000 people. And the order was 2, which is 380,000 people in total. There was virtually no change. What did the district court, with regards to the districts that you're here about, what did the district court order the legislature to do? The district court ordered the legislature to draw two additional black majority Senate districts in South Metro Atlanta and two additional House districts. But, and I would point to that, it did not do that. And let me be clear. Looking at page 512 of the district court's liability ruling, the court goes on, so 510 to 511. The district court says two additional districts, but it then goes on to say there must be a complete remedy, citing Dillard. And it goes on to say we're going to need to look at these districts to see whether an additional opportunity district has been added in South Metro Atlanta. Right? So it's not merely is there an additional district. But even, even, Your Honor, if we're just asking are there additional districts in South Metro Atlanta, the answer is no. Districts were displaced and moved north, and new district numbers were put in their place. But what we don't have are two additional opportunity districts for black voters in South Metro Atlanta. And I submit to you that looking at the effect on voters is really what shows that most clearly. How many black opportunity districts existed in 21 when the challenge was made? So if you look at the districts that the court identified and identified as the area that would need to change, there were 10, again talking about the Senate, there were 10 districts in total. Five of those were black majority districts. Okay. How many are there now? Depending on how you count, it's between four and a half and six. In other words, if you want to include those districts that touch that dilution area, at least 50% of them are in there. It's six, but a number of those are just over 50%. About half of them are out. And if you sort of rationalize it, it's four and a half. So either way, you're not getting seven. So if you want to look at the case that way, and, again, we submit. You said two more. The number was four. Correct. Why is it six, four plus two? No, originally there were five. There were five. So the area the court identified was a 10-district area. Five of those were already black majority districts. And if you want to look at that same area and say, well, now how many black majority districts are there in that area, depending on how you define it, because if we're using districts, then they're not going to line up exactly. Take the worst position for you, which is the area gets a little bit broader and it's not tied to four district lines. You say six. Yeah, the worst position for me would be six. And, again, what you want to see is seven to comply with the court's order. Why would the district court think that the legislation complied if the math didn't play out the way you say it played out? Because the district court didn't look at the math. It didn't look at the numbers that we submitted that, again, are undisputed. Instead, the court looked at a map that showed 17 is within that area it identified, 28 is within that area it identified, and it took the labeling of those districts as sufficient. It said, oh, these are new. Even though those districts are comprised almost entirely. In the case of District 28, 80% of the district is from areas that were already in black majority districts. Voters already are electing candidates of choice, no injury. And the other 19% is from Cobb County, where we didn't have a trial about Cobb County. No one proved vote dilution. Again, no Section 2 right. So I don't want to derail you, and I want to let you make the argument you wanted to make. Thanks, Your Honor. And this is what I want to talk about. I do think the most important thing is to conceptualize this in terms of the harm to voters, because that's what the court does in Shaw, and that's what the court does in LULAC as well. The court talks about what is the harm to individual voters, and is that being remedied? And the court in Shaw and in LULAC even looks to, well, how many injured voters? In Shaw, how many voters from Mecklenburg County are being included in the remedial district? In LULAC, 548 pages 420, 548 U.S., excuse me, pages 429 to 431, the discussion for the court on vote dilution, the court is looking at, well, how many voters from the area where there's dilution are included in this other district that was drawn instead? And it says it's not, the other district is not sufficient because the majority of those voters who are suffering from dilution aren't included. Here, when we look at the situation of voters, it is very clear, especially in the Senate, there's no remedy at all. In the House, it's a partial remedy. So the district court's error, I think, was understandable because these remedial proceedings were operating on an extremely compressed schedule in order to meet the 2024 election calendar, but it does rest on a fundamental misapprehension of the law. And so what we're asking the court to do here is to apply Shaw, apply LULAC, and reverse because dilution injuries experienced by voters in a particular place, and they are experienced by individual voters in a particular place, here, South Metro Atlanta, cannot be remedied by the addition of tens of thousands of voters who have no Section 2 right in other parts of the state, in North Metro Atlanta, and that's what happened here. Now, give the court You've got to deal with the one-person, one-vote requirement, too. So the notion that a Section 2 violation has to be remedied strictly within the old district lines is sort of hard to imagine practically. That is absolutely correct, Your Honor. Especially when the census has sort of shifted population demographics. That's absolutely correct, and we do not and have never argued that the remedial districts must be confined to any particular area. What we have argued is that you must substantially address. This is what Shaw says, page 917 of Shaw. You need to substantially address the violation. Are some of the remedial districts going to go outside of the area where there's a violation? Maybe. That may happen. It's certainly a rough human process. But when you're including virtually none of the voters who have an injury, and that's the case in the Senate. That's why I'm focusing the court in the Senate. In the House as well, numerically, you just can't get two majority districts in South Metro Atlanta for injured voters. But it may be a partial remedy. In the Senate, there's just zero remedy at all. So our argument has never been that the State was confined to any area. Our argument is only that the State needed to fix vote dilution in South Metro Atlanta and whatever else it did anywhere else. Why is the focus on voters that were unaffected before as opposed to remedies given to voters that were affected? One or the other? I think the focus is on how many voters are being added to black majority districts because that is the way that you remedy vote dilution. Because the nature of Section 2 is that minority voters have less opportunity to participate and elect candidates of choice because of racially polarized voting. And so allowing those voters who are injured to join, who are not in affected majority districts, to join into affected majority districts, that's the remedy. And so the question is, well, how many voters who are injured from South Metro Atlanta are being added? And, again, we presented the numbers, and they're undisputed, and the district court didn't look at them. Why does it matter where the voters are being added from if it's from the same general area? And if, and I know it's a big if because you contest this, and if it solves the vote dilution problem. If the claim was we had a black opportunity district, let's say, I'm just going to make up the number, District 1. And the 2021 map sort of splintered, cracked that district and diluted black voting strength. And now the new map adds black voters, maybe not the ones who were there before, but some from an adjacent part somewhere else on the square. And it solves the vote dilution problem for that general area. Where is the problem? So there's no problem if you go a little bit outside of the area, as long as you bring voters who are in the area into a new majority black district. And that is the thing that is not, in a sense, it's simply not happening. Why does it have to be? Because the people who are affected are the ones who are suing who were, in my words, cracked. So by the initial redistricting plan, they're the ones whose voting strength is harmed. If your voting strength is brought up to where it was before, and the addition is from voters from an adjacent plot of land, what's the problem? That would be fine, but that's not what happened here. And no one's arguing otherwise. You seem to me to say that voters who were unaffected by the vote dilution are now being brought in to solve part of the remedy. No. They're being brought in in order to create a total increase statewide of black majority districts. But the increase isn't happening in the place where the voter's being injured. Statewide, you have an increase, but in the South Metro Atlanta area, you do not. And so if you look at the areas in South Metro Atlanta where we focus the trial, Fayette County, totally unchanged. Henry County, barely changed. The changes in Henry County are offset by Newton County. These are all the main counties that we focus on in South Metro Atlanta. And if you look at the situation of the voters there, there simply isn't a net change in how many black voters in black majority districts. All the change is happening outside of the area. And I, again, just point the court to LULAC, the creation of an opportunity district for those without a Section 2 right, and LULAC speaks in terms of individuals, is no excuse. I've taken you way beyond your time. So you can have a couple of seconds to wrap up, and then you can save your time for rebuttal. Thank you, Your Honor. I'll just finish the quote. It's no excuse for the failure to provide an opportunity district for those with a Section 2 right. That's what happened here. Those in South Metro Atlanta didn't get the opportunity districts. Thank you. Thank you, Your Honor. May it please the Court. The state could not produce additional compact majority black districts in the Atlanta area if it tried, which means we necessarily satisfy Section 2 because no plaintiff could prove Jingles 1, the possibility of an additional compact black majority district. I'm going to interrupt you, since you're interrupting me with the same question. Yes. Tell me, on the Senate side, let's use the Senate as just an example. Tell me what the numbers were in the 2021 plan, and what changed, if anything, with the 2023 plan. In terms of the number of districts, which, by the way, is what Section 2 is concerned about, not this totally made up, invented, how many voters were moved here and there. It's about the number of black majority districts. In the Atlanta area previously, there were 10. Now there are 12. But if we are going to look at the black majority districts, those are the same thing in this case, Your Honor. They're really the same thing in every case, but the district court specifically rejected this notion that it said anything about nonblack majority districts. It said we need two extra, using the Senate as an example, you need two extra black majority districts. Yes, it used the term black opportunity districts, but that's because that was the term it used for black majority districts throughout the case. And both at the hearing below and in its order, it could not have been more explicit that what it meant by that was black majority district. And by the way, the district court gets extreme deference in interpreting its own order, which goes to a separate point, which is there are three layers of deference that the plaintiffs have to get through here. But the point is that basically what plaintiffs want is at the liability stage. We argued very heavily, look, you've got crossover districts, a coalition district, influence districts. You know, we should not be liable at all. Black voters have extreme opportunities, if not the same political opportunity, greater political opportunity than nonblack voters. And the district court rejected that argument and said, no, I'm looking at black majority districts. I'm not looking at, for instance, crossover districts, coalition districts, et cetera. So now the plaintiffs are turning around and saying, well, you didn't really increase our opportunity because in adding the new black majority districts, you didn't maintain, for instance, crossover districts. Setting aside that that's just completely barred by Strickland, that's completely the opposite of what the argument was at the liability stage. And so to turn around now and say, no, actually, those districts all counted, those all really mattered, but you weren't allowed to touch them, is the depth of hypocrisy. But I also want to add that these numbers, even the numbers that, again, I don't think have anything to do with the Section 2 analysis, which is this, like, how many additional black voters in certain counties did we add? They're gerrymandered to begin with. They're just talking about certain counties they picked out. They're not, like, the only relevant counties. But even if you look at that, that's just not, like, that's not what Section 2 is looking at. It's looking at what is the majority, the number of majority black districts. If you were to say, well, we need to put more black voters in these districts than they already have, in most cases, I get that it works out in this particular case to help Democrats in this particular case, because as you keep going south and further and further south, you're really picking up mostly rural white Republican voters. But in most cases, plaintiffs would be saying, you're not allowed to put more black voters into black majority districts. That's called packing. And so this is a completely gerrymandered argument for this case only, where they're basically saying, like, we would like to twist the lines a little bit to help our partisan advantage, even though we have the right number of black majority districts in the area. What do you make of Stravinsky's guesses four and six numbers from that? He seems to be going based on this concept that the plaintiffs have invented called the vote dilution zone, which is the specific districts they mentioned in their complaint. That is not a Section 2 concept. As such, the Section 2 is interested in populations of minority voters in a particular region. We are in no way limited to or have to care particularly about which districts they happen to challenge. In fact, it would be really weird if we did. The whole point of a Section 2 claim is I don't care what these lines say. There's a minority population here that could have more minority majority districts and doesn't. And so these lines are the problem. So to then turn around and say, well, within those district lines, those former district lines, you didn't add enough black voters, it just doesn't make any sense of Section 2. And I want to briefly talk about — He said that he — at argument, he said he is arguing that the remedy has to stick within the old district lines. Well, two points on that, Your Honor. First of all, that's exactly what they argued below. And I know they're now saying that they didn't. But we understood them that way, and the district court understood them to be saying that and specifically rejected that argument. So, you know, you can agree to disagree there. But the point is, like — The district court certainly understood part of their argument that way in its order. But there — so there — even if you were to accept this kind of weaker version of the argument, it just goes to — well, it has to be largely in the vote dilution zone, whatever that means. I mean, first of all, then we're really in clear error or abuse of discretion territory. And the idea that this Court would say that Judge Jones, who sat with this case for years, got this wrong, I think is really beyond the pale. But regardless, I think it just goes to show that they don't really have a theory here. Because what are they really asking for? Are they saying 1,000 extra black voters would be sufficient? 2,000? 3,000? I mean, how many voters in these areas are we supposed to put in, and then we know we're past — you know, we're outside of liability? And I want to talk about Lulac and Shaw, because I think it — Yeah. Do you recall — this is a case with a lot of numbers and a lot of evidence, so I don't expect any of you to have immediate recall, but do you know the general ballpark percentage of the 12? Like, what was the low in terms of black voting age population, and what was the high? So I'm going to be up here a lot over the next hour and a half, and we can get those numbers for you. I can tell you — Yes. I can tell you that on the low end, it's going to be just, you know, black voting age population, you know, right above 50 percent, so 50, 51 percent, et cetera. And by the way, that's usually what plaintiffs want. What they usually want is just enough to kind of guarantee, you know, victories, but not so many that you started to pack voters in and start to lose opportunities elsewhere. But I'm going to talk about Lulac and Shaw just briefly. Lulac is about a case in which the court held, you have not created the correct number of majority-minority districts because this one you're claiming is a majority-minority district is not compact. And it's so non-compact, it's stretching from the Texas-Mexico border around Laredo, 300 miles to Austin to pick up a completely unrelated Latino population. That was what Lulac was saying, is you can't create a non-compact, completely — I mean, just essentially nonsensical district, call it a Section 2 district, and use that as a justification for, you know, being required to racially gerrymander or something like that. That would be us creating a district that starts in Atlanta and ends in Augusta, not us slightly adjusting all the district lines in Atlanta because the black voting population in Atlanta is relatively concentrated in central and south Atlanta, kind of along I-20 east-west. Every district you move is going to move another district. They're all contiguous. They're all touching one another. They're all coming from the same basic concentration of black voters. That is nothing like Lulac. Shaw is a similar thing. Shaw, we put the map in our brief so that you could see it. That is the most outrageously non-compact district you can imagine. And, again, the Court, when it said, when the Court said you cannot violate the Section 2 rights of people who have them for people who don't, it specifically meant, and this is very clear if you read these cases, you don't have a right to be in a non-compact black majority district or a majority-minority district. That's what the Court was saying. But what the Court also said, and it emphasizes again and again, was that the relevant point is geographic compactness. And there is no doubt that we have created the correct number of geographically compact black-majority districts. So everything else the plaintiffs are arguing about here is trying to come up with some statistic here or statistic there that seems to suggest that somehow we did something wrong, but we comply with Section 2 because we have the right number of districts, and we comply with the district court order because we put them in the right places. And for the plaintiffs to claim that the district court got its own order wrong, you would need something like the district court was looking at a map of West Virginia when it should have been looking at a map of Georgia. I mean, that's the degree of deference we're talking about here because we're talking about legislative deference in drawing the map, the district court's deference in factual findings, and the district court's deference to the district court in interpreting its own order. Now, I'm... The plaintiffs are saying part of it. This doesn't run into the vote dilution problem the district court found because it focused on the wrong voters or omitted some of the affected voters who weren't included in the neighborhood. Yeah. So two basic points there, Your Honor. Factually, you can never, you just literally can't, get every black voter into a black-majority district, and you wouldn't want to. I mean, that's called packing. So, I mean, it is true that second choose an individual right, but the Supreme Court has also been extremely clear in Shaw, Lulac, and elsewhere that it's not a right to be in a majority-black district, or a majority-minority district. It's a right to have the correct number of majority-minority districts. And so the idea that there are voters still not in these districts is not only, you know, common, it's necessary. There are always going to be additional minority voters who are not in the districts. And again, in most instances, that's actually going to be what plaintiffs prefer because they want majorities but small majorities in these districts so that they then also have influence in other districts as well. And really, all of this comes down to is we did put these districts in the right place. We did go further down south into, you know, south metro Atlanta, west into west metro Atlanta with the relevant districts. But all that is going on here is the plaintiffs wanted us to go further south because there's a lot of white Republican voters as you keep getting into more rural areas in Georgia, whereas in the central, in the more central areas of Atlanta, they tend to be white Democrat voters. I mean, that's all that this is about. And so every argument they're coming up with is basically, honestly, is just a way around Strickland. Strickland says we don't have to create or maintain crossover districts. And, candidly, we didn't. There were crossover districts. We did not maintain them. They know they can't really get at us for removing these crossover districts. And so they're trying to circumvent that with every creative way they can. But at bottom, what we did is we created the correct number of black majority districts. We put them in the places where they were supposed to go. And the district court, which just a month and a half previously, by the way, had ruled against us on liability, found that they were where they were supposed to be. And even by plaintiffs' own made-up concept of the, you know, vote dilution zone, our districts are almost all and almost entirely within those. I mean, like, you look at the maps that we provided, that the district court provided, we're not really going that far outside of them. So, you know. Let me ask you a question about that. So, assuming for this question that the remedial plans, as you say, added the additional majority black districts as the district court instructed, so you have the same number of districts, but they drew 99 percent of their black voting age population from outside the area identified as the dilution zone. Maybe close by, but outside. Would that be a complete remedy? Yeah. I don't think the vote dilution zone matters at all. I think it's the general region that the court was looking at, and the district court was very clear about this. It said, I only mentioned, specifically said this, I only mentioned the specific numbers of the districts that had previously been there just to show you the region. And so, just to But that's the area where the harm occurs. The harm is occurring. Well, no. To be clear, Your Honor. You're not taking a surgeon to that district, but to address the harm in that area. Well, to be clear, Your Honor, that's not necessarily the case, because you've got to remember that, again, Section 2 is based on regions, not necessarily the district lines. So they keep saying, well, the people we added don't have a Section 2 right. That's not true. What they mean is, what they really mean is that they were in districts that were, in certain instances, already electing Democrats, but that doesn't mean that they don't have a Section 2 right. But to just get back to your specific question of the 99%, as long as it's in the region, I don't think it matters at all. If what you're saying is it's 99%, you know, 100 miles away in a totally different area of the state, well, then, no, I don't think that that would remedy the But the reason for that would be, well, that district just isn't even in the region at that point. The hypothetical contemplates that only 1% of the people who are found to be harmed are actually getting a remedy, and that's okay under your view? Well, no. Again, I can test the premise, Your Honor. I don't think that the way that Section 2 works is that you look in specific districts and say, well, those are the only people that are harmed. Again, you're looking at it as what's the region, the population in a particular region that's entitled to a certain number of majority black districts. So if that were true, if all we had to do was worry about the people in the districts they challenged, then we could have completely left other black voters out of majority black districts, and they would have then complained about that. But we still have to have the right number, one way or the other, to address the population in general. You can't just focus on, say, well, we only challenged this one district, so that's the only thing that you can deal with. Again, you do not have, just to put this in the Supreme Court's terms, you do not have a right to be in a majority black district. You only have a right to have the right number. So as long as they are compact majority minority districts, and here they're all contiguous, they're all in the same region, there really is nothing else to be done. And if we were required to basically do what plaintiffs want us to do, which is draw the lines more or less exactly as they would have done it, I mean, the deference and choice that legislatures are supposed to have in being able to draw the precise lines of districts would be totally gone. The deference to the district court would be totally gone. The deference to the court understanding its own order would be totally gone. I think we're plainly right on these issues, but even if you think that they're disputable, tough, difficult questions, the district court was on our side, and that really matters here. Thank you, Your Honors. Logan, Your Honors, and I'm going to try to make four points if I can with this limited rebuttal time. First, my friend spoke about, well, this is about the number of districts. It's not. It's exactly what Shaw and Lulak say. It's not. In Shaw, they had the right number of districts. In Lulak, they had the right number of districts, right? They added a district somewhere else in an adjacent area of south Texas. The number of districts didn't matter. It's whether the voters who are experiencing harm are having that harm remedied. Now, we talked about the number of districts in the Atlanta. You said that you looked at that in the abstract, but you've got to look at the district court's injunctive remedial order. That's— The remedial order was required. That's correct. You didn't talk about it in the abstract. That's absolutely correct, and the district court ordered— and, again, we can talk about the vote dilution area. We can talk about regions. South metro Atlanta. And I want to be clear. We can't conflate the Atlanta metro area writ large with south metro Atlanta. The population of Atlanta is massive. The metro area is massive. Atlanta is the same size today as the entire state of North Carolina was when Shaw was decided. So going to a different part of Atlanta to create black majority districts and create new opportunities for black voters is not sufficient, and it is outside of whatever region it is, the region called the vote dilution zone. We have not been picky about that. And I want to get to one other point. You know, we have made the same argument consistently. This is docket 370 from below, page 2. The proposed plans do not create additional black majority opportunity districts in the areas where the court determined black voters are being harmed. What do you mean by black opportunity districts? Districts where black voters can combine effective majorities to let That's basically a coalition district or a crossover district. No. That's not a black majority district. No, and just to go on. Is that right? So we're not You are voting. This doesn't mean you're right or you're wrong or they're right or they're wrong, but I want to make sure I've got the terminology right. When you say the legislature didn't do enough and the district court made a mistake, you are focusing not on black majority districts. You are focusing on districts where black voters, although not a majority, can link up with other groups and elect a candidate of choice. Am I right or wrong? You are wrong about that, and the passage I'm reading from page 2 of our apply brief makes clear we argue that in the district court as well. It does not matter if the legislature dismantled so-called coalition districts. It doesn't matter if they dismantled districts in North Metro Atlanta that were electing Democrats. It's exactly what we say in the district court. What matters is that voters whose rights have been violated don't live in North Metro Atlanta where these changes were made. They live in South Metro Atlanta. And whatever else the legislature did, if they want to dismantle coalition districts somewhere else and neutralize the partisan effects of having to comply with the Voting Rights Act in South Metro Atlanta, that's fine. For our purposes, fine. But you have to remedy the injury to the voters who are harmed. And here, the voters who are There were no new districts created in South Metro Atlanta? No. I mean, I think in the House there's probably one. You have a partial remedy. In the Senate, if you look at how many voters have been added to black majority districts from South Metro Atlanta who are not already in them and who have been added to them, it's less than half a percent of a single Senate district. Their own numbers show it. Their own numbers show the percent of black voters in black majority districts in South Metro Atlanta doesn't change between the proposed between the 2021 plan and this plan. The statewide number goes up about five points because of all the changes happening elsewhere in North Metro Atlanta. That is a different area. It is a different region, whatever you want to call it. It's a different part of the state. That's exactly what Shaw and Lulak say you cannot do. Why do you think the district court thought that the legislature's redrawing in that area was okay? I think, again, the district court fundamentally didn't look at these numbers at all, didn't engage with them. It looked at a map. It looked at a map that showed that there's District 17. District 17 used to be a white majority district. Now it's a black majority district. The reason is because they changed it. They took the label off District 17, put it in a different area. They put 42, the new label, on District 17, but it looks exactly the same. And it still cracks black voters. The same VVAP in South Metro going from Henry County out to Walton and Morgan counties. The same vote dilutive cracking district is there, but they put a different label on it. And I think we were moving very quickly, and the district court simply misapprehended the law and didn't look at the evidence. At a minimum, you can vacate, remand, and let's look at the evidence of what happens to injured voters. It didn't happen here at all, and especially in the Senate, the result is egregious and it's a lack of a remedy for black voters who need one and are entitled to one. Thank you very much.